**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SHERRY WOFFORD,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:12-CV-681-N (BF)** |
| | § | |
| **COMMISSIONER OF THE** | § | |
| **SOCIAL SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

This is an appeal from the decision of the Commissioner of the Social Security Administration ("the Commissioner") denying the claim of Sherry Wofford ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"). The Court considered Plaintiff's Brief, Defendant's Brief, and Plaintiff's Reply Brief. The Court reviewed the record in connection with the pleadings. For the following reasons, the Court recommends that the District Court AFFIRM the final decision of the Commissioner and dismiss Plaintiff's Complaint with prejudice.

**Background**[1]

**Procedural History**

On February 6, 2006, Plaintiff filed an application for DIB benefits under Title II of the Act, alleging disability due to "psychardosis/right shoulder/lower back/neck, high blood pressure/chol". (Tr. 200, 216.) Plaintiff alleged that her disability began on November 1, 2002. (Tr. 200.) Plaintiff's claim was initially denied, and she requested a hearing before an administrate law judge ("ALJ").

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

(Tr. 104-07, 119-21.) The hearing was held in Dallas, Texas on October 2, 2007, before ALJ Rita R. Carroll. (Tr. 20.) Medical expert ("ME") Dr. John R. Vorhies, and vocational expert ("VE") Thomas R. Irons appeared and testified at the hearing. (*Id.*) Plaintiff also appeared and testified on her own behalf. (*Id.*) The ALJ issued an unfavorable decision on November 23, 2007. (Tr. 17-27.) Plaintiff requested review of the decision from the Appeals Council, but the request was denied on December 19, 2008. (Tr. 1-10.) Accordingly, the ALJ's decision became the final decision of the Commissioner, and Plaintiff sought judicial review from the United States District Court, Northern District of Texas pursuant to 42 U.S.C. § 405(g).

On December 30, 2010, the court remanded Plaintiff's claim back to the Commissioner for reconsideration because the ALJ posed a defective hypothetical to the VE and then relied on the VE's testimony in making her step five determination. (Tr. 986-95.) On January 24, 2011, the Appeals Council ordered the ALJ to conduct another hearing on Plaintiff's claim. (Tr. 982-85.) The same ALJ conducted a second hearing on March 16, 2011. (Tr. 835.) Plaintiff, represented by counsel, appeared and testified at the hearing. (*Id.)* A VE testified at the hearing as well. (*Id.*)

The ALJ again issued an unfavorable decision on April 18, 2011. (Tr. 832-51.) Plaintiff requested the Appeals Council to assume jurisdiction over Plaintiff's claim, however, the request was denied on February 7, 2012. (Tr. 812-16, 821-31, 808-11.) Thus, the ALJ's decision became the final decision of the Commissioner from which Plaintiff now seeks judicial review under the authority found in 42 U.S.C. § 405(g).

**Plaintiff's Age, Education, and Work Experience**

Plaintiff was born on September 1, 1967, and was 39 years old on her date last insured.[2] (Tr. 842.) Plaintiff is defined as a younger individual under the Act. (*Id.)* Plaintiff completed the eleventh grade through special education courses, but she does not have a GED. (Tr. 34-35.) Plaintiff's past relevant work includes a cafeteria attendant, custodian, hospital cleaner, and warehouse worker. (Tr. 842.)

**Plaintiff's Medical Evidence**

Plaintiff was hospitalized in November 2001 for dyspnea and cough. (Tr. 579, 582.) X-rays showed interstitial infiltrates. (Tr. 580.) Plaintiff was diagnosed with sarcoidosis and she was started on Prednisone treatments. (Tr. 582.) Upon discharge, Dr. E. Duane Dilley noted that Plaintiff's symptoms had improved and she was in stable condition. (*Id.)* Plaintiff completed a course of steroid therapy for her dyspnea and diffuse infiltrates and was taken off steroids in February 2002. (Tr. 330-31.) However, in August 2002, Plaintiff presented to the emergency room with complaints of dyspnea. (Tr. 330.) Plaintiff told the doctor that she cleaned her bathroom a few weeks ago with Comet and ammonia, and she may have inhaled some fumes. (Tr. 331.) Upon examination, Plaintiff was found to have interstitial pulmonary infiltrates, and she was admitted to the hospital for treatment for six days. (Tr. 330.) The doctor noted that Plaintiff had been off her steroid treatments for six months. (*Id*.) Upon discharge, Plaintiff was diagnosed with sarcoidosis, and interstitial infiltrates, dyspnea, and hypoxemia all secondary to sarcoidosis. (*Id.*) Plaintiff was discharged in stable condition and it was noted that her oxygen saturations had improved, she was eating well, and she was ambulatory. (*Id.)* Plaintiff was placed back on Prednisone. (*Id.*)

---

[2] Her date last insured was December 31, 2006. (Tr. 835.)

On June 27, 2003, Plaintiff had a follow-up visit with Dr. Dilley, wherein it was noted that her sarcoidosis was inactive and stable with the steroid treatments. (Tr. 568.) On May 12, 2004, Plaintiff had a follow-up exam with Dr. Sherif Al-Farra. (Tr. 437-38.) There was no evidence of active sarcoidosis found, but Plaintiff complained of occasional blurred vision and so the doctor referred her to an ophthalmologist. (Tr. 437.) Dr. Al-Farra noted that Plaintiff was in no apparent distress and her sleepiness had decreased since she began C-PAP therapy for her obstructive sleep apnea. (Tr. 437.) On October 11, 2005, Dr. Al-Farra conducted another examination of Plaintiff, wherein he again found that there was no evidence of active sarcoidosis. (Tr. 453-54.) The doctor indicated that this may be due to Plaintiff taking Prednisone. (Tr. 454.) The doctor also noted that Plaintiff's shortness of breath had improved significantly with her continued use of steroids. (*Id.*)

On March 28, 2005, a pulmonary test showed Plaintiff had normal lung volumes and a minimal gas transfer deficit. (Tr. 290.) Dr. Dilley examined Plaintiff in March 2006 for shortness of breath and sarcoidosis, but x-rays showed no active disease. (Tr. 565.) Dr. Dilley noted that Plaintiff's last visit was approximately two years prior. (*Id.*) In July 2006, Plaintiff was hospitalized for six days due to shortness of breath. (Tr. 570.) The doctor noted that Plaintiff had been off her steroid treatments for six months. (*Id.*) X-rays showed diffused interstitial infiltrates consistent with sarcoidosis. (*Id.*) Plaintiff was discharged in stable condition and placed back on Prednisone. (*Id.*) The doctor noted that Plaintiff's headaches had markedly improved, she was eating well, and she was ambulatory. (*Id.*)

On August 4, 2006, Plaintiff had a follow-up visit with Dr. Dilley. (Tr. 563.) Plaintiff complained of being somewhat short of breath, but she indicated her symptoms had improved since her hospitalization. (*Id.*) X-rays showed markedly decreased interstitial infiltrates. (*Id.*) The doctor

noted that Plaintiff was doing "a good bit better" and her sarcoidosis was "currently clinically improved." (*Id.*) At a follow-up visit in December 2006, Plaintiff stated that she was doing fairly well, but she still had some shortness of breath and chest pain. (Tr. 693.) X-rays were normal and indicated that Plaintiff's sarcoidosis was inactive. (*Id.*) Dr. Dilley opined that Plaintiff's mild chest pain could be related to a cardiac impairment, as she had gained a lot of weight on steroid therapy. (*Id.*) However, a cardiac catheterization in January 2007 showed normal LV systolic function and no significant coronary disease. (Tr. 706.) Dr. Michael Graceffo indicated that Plaintiff's chest pain was non-cardiac. (*Id.*) He reported Plaintiff still experiencing some chest pain, but his impression was that she was doing reasonably well. (*Id.*)

On April 6, 2006, a state agency medical consultant completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (Tr. 461-68.) Dr. Frederick Cremona opined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds, stand and/or walk for 6 hours and sit for 6 hours in an 8-hour workday, and push or pull unlimited. (Tr. 462.) He opined that Plaintiff had no further limitations. (Tr. 463-65.) The doctor indicated that a chest x-ray revealed normal heart size and no evidence of sarcoidosis. (Tr. 468.)

On October 24, 2007, Dr. Dilley issued a "Medical Statement Regarding Sarcoidosis for Social Security Disability Claim." (Tr. 805.) Dr. Dilley noted that Plaintiff's sarcoidosis was manifested through a biopsy showing granuloma, chronic cough, and dyspnea on exertion. (*Id.*) Plaintiff's lungs were mildly involved, but she showed no other manifestations of sarcoidosis. (*Id.*) The doctor noted Plaintiff had mild fatigue and malaise. (*Id.*) Dr. Dilley opined that Plaintiff could stand for thirty minutes at a time for a total of one hour in an eight-hour workday. (*Id.*) Plaintiff could sit for two hours and work for a total of two hours a day. (*Id.*) Dr. Dilley also opined that

Plaintiff could not lift and carry objects even occasionally throughout the day. (*Id.*) In a subsequent medical statement issued on February 1, 2008, Dr. Dilley opined that Plaintiff would be unable to work any length of time due to her sarcoidosis. (Tr. 800.)

On January 16, 2004, Plaintiff underwent a sleep study which showed mild initial respiratory disturbance that increased to severe during her REM cycle. (Tr. 542.) Dr. Al-Farra noted her symptoms were consistent with obstructive sleep apnea, which was possibly complicated by her sarcoidosis. (*Id.*) Dr. Al-Farra recommended C-PAP titration, but he noted that an MSLT sleep study might be necessary if Plaintiff's daytime sleepiness and fatigue did not resolve. (*Id.*) On March 16, 2004, Plaintiff was diagnosed with mild obstructive sleep apnea syndrome with associated hypoxemia. (Tr. 417.) Plaintiff presented to Dr. Al-Farra on September 20, 2005. (Tr. 492.) She told the doctor that she did not use her C-PAP machine the night before. (*Id.*) Dr. Al-Farra noted that Plaintiff's sleepiness scores are within normal limits when she uses C-PAP. (Tr. 493.) Plaintiff was advised to use her C-PAP machine on a regular basis. (*Id.*) On November 17, 2005, Dr. Al-Farra noted that Plaintiff had excessive daytime sleepiness and lack of sufficient sleep. (Tr. 455-56.) His treatment notes indicated that Plaintiff watches television until around 2 a.m. (Tr. 455.) The doctor also noted that Plaintiff "has not implemented most of the sleep hygiene recommendations that I had made previously." (*Id.*) He indicated Plaintiff was regularly using BIPAP therapy (similar to C-PAP therapy), and he advised her not to drive until her excessive daytime sleepiness had resolved. (Tr. 455-56.) He reminded Plaintiff of the importance of following his sleep hygiene recommendations. (Tr. 455.)

In March 2006, Plaintiff fractured her distal fibula, and she also sustained ankle mortise disruption, indicating soft tissue injury. (Tr. 369.) The doctor noted that there was soft tissue

swelling around the ankle joint. (*Id.*) On March 9, 2006, Plaintiff underwent an open reduction internal fixation of her ankle with screws and a plate. (Tr. 637.) On May 31, 2006, the doctor noted that Plaintiff was doing very well, as her incisions had healed, her range of motion was good, and the swelling was down. (Tr. 636.) Plaintiff did, however, complain of irritation from the screws and plate in her ankle. (*Id.*) In July 2006, Plaintiff had one of the screws in her ankle surgically removed. (Tr. 638.) Subsequent examinations showed good alignment of Plaintiff's ankle, but she still had some lateral soft tissue swelling. (Tr. 634.) On March 27, 2007, due to continued pain, Plaintiff had surgery on her left ankle to remove the hardware. (Tr. 719.) It was noted that there were no complications and Plaintiff was in stable condition. (*Id.*)

**Plaintiff's Testimony at the Hearing**

At the second hearing held on March 16, 2011, Plaintiff testified that she takes care of her niece, by getting her up, making her breakfast, and sending her off to school. (Tr. 866-67.) Plaintiff testified that her family helps her financially with her niece. (Tr. 865-66.) Plaintiff stated that when her niece was younger, she used to help her with her homework. (Tr. 867.) Plaintiff said that she has taken care of her niece all of her life. (Tr. 878-79.) Plaintiff testified that she can bathe, dress, and take care of herself. (Tr. 866.) She stated that she tries to do the housework. (*Id.*) Plaintiff testified that she has a driver's license but the last time she drove was three months ago. (Tr. 872-73.) Plaintiff then said it may have been a year ago. (Tr. 873.) Plaintiff testified that she goes to church two or three times a month, and she visits with her neighbors once or twice a week. (Tr. 882-83.)

Plaintiff testified that her ankle still bothers her on and off. (Tr. 868.) She said that she is taking Prednisone and blood pressure medication. (*Id.*) Plaintiff testified that the Prednisone "keeps it from feeling drowsy and stuff". (Tr. 869.) Plaintiff stated that she continues to suffer from

sarcoidosis, breathing problems, sleep apnea, and chest pain. (Tr. 883-84.) Plaintiff also testified to experiencing migraine headaches. (Tr. 884.) Plaintiff testified that she now has some depression and anxiety, but she didn't during the relevant time period for which she is seeking disability. (Tr. 885.) Plaintiff said that she has trouble reading and with math. (Tr. 888.)

**The Hearing**

Susan Brooks, a VE, also testified at the second hearing as to the availability of work in the national economy. The ALJ posed the following hypothetical to the VE: assume an individual of Plaintiff's age, education, and work experience who was limited to lifting 20 pounds occasionally and 10 pounds frequently; standing and walking 2 hours and sitting 6 hours in an 8-hour workday; could not use ropes, ladders, or scaffolds and could only occasionally stoop, crouch, balance, kneel, and crawl; could not be exposed to chemicals, fumes, gases, temperature extremes; and was limited to simple work and reading and writing at third to fifth grade levels. (Tr. 900.) The VE explained that the hypothetical individual could not perform Plaintiff's past relevant work, but could perform other sedentary, unskilled work. (Tr. 900-01.) The VE proffered three occupations: final assembler, cutter and paster, and addresser. (Tr. 901.)

Upon cross-examination, the VE testified that a person who misses two or more days per month would be precluded from competitive work. (Tr. 903.) The VE also testified that a person who needed breaks beyond the normal break time would be unable to sustain employment. (Tr. 903-04.) The VE stated that if a person could not repetitively push and pull, feel, grasp, touch or manipulate, then that person would be precluded from the occupations the VE proffered. (Tr. 904.)

**The Decision**

In the August 25, 2010 decision, the ALJ followed the five-step sequential evaluation process found in 20 C.F.R. § 404.1520(a).[3] (Tr. 832-51.) As a preliminary matter, the ALJ clarified that the time period relevant to Plaintiff's Title II claim was her date of onset, November 1, 2002, through the date she was last insured, December 31, 2006. (Tr. 835.) However, the ALJ explained that she also considered evidence after Plaintiff's date last insured up to April 27, 2010, the date Plaintiff was subsequently approved for benefits on another application, in the event that eligibility could be established for Supplemental Security Income for Plaintiff during that time period. (*Id.*)

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity at any time relevant to her claim. (Tr. 837.) At step two, the ALJ found that Plaintiff's sarcoidosis, obesity, status post ankle fracture, learning disability, and sleep apnea were "severe impairments." (*Id.*) At step three, the ALJ determined that none of Plaintiff's severe impairments met or medically equaled any of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 838.)

Before proceeding to step four in the evaluation process, the ALJ assessed Plaintiff's RFC. (Tr. 839.) The ALJ found that Plaintiff retained the ability to lift and carry 20 pounds occasionally and 10 pounds frequently. (*Id.*) The ALJ also limited Plaintiff to standing or walking for two hours and sitting for six hours in an eight-hour workday. (*Id.*) Plaintiff was further limited to occasional crawling, bending, and stooping, and she could not be required to climb. (*Id.*) The ALJ determined

---

[3] At step one, the ALJ determines whether the claimant has been performing substantial gainful activity since the date of onset. At step two, the ALJ determines whether the claimant has a medically determinable "severe" impairment. At step three, the ALJ looks at whether the impairment meets or medically equals a listed impairment. At step four, the ALJ determines whether the individual can perform past relevant work based on her RFC. At step five, the ALJ inquires whether there is any other work in the national economy the individual could perform considering the individual's age, education, past work, and RFC.

that Plaintiff should avoid exposure to fumes, gases, chemicals, and temperature extremes; and she was limited to simple work requiring reading and writing at no more than a third-grade level. (*Id.*)

At step four, the ALJ found that Plaintiff was unable to perform her past relevant work. (Tr. 842.) At step five, the ALJ determined that, given Plaintiff's age, education, work experience, and RFC, she could perform the jobs of final assembler, paster/cutter, and addresser. (Tr. 843.) Thus, the ALJ concluded that Plaintiff had not been under a disability at any time relevant to her claim. (*Id.*)

### Standard of Review

To be entitled to social security benefits, a plaintiff must prove that she is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes her from performing her past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan*, 38 F.3d at 236; 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. However, "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). Moreover, the terms of 20 C.F.R. § 404.1527 define "medical opinions" and instruct claimants on

how the Commissioner will consider the opinions.[4] In the Fifth Circuit, "the opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability." *Newton*, 209 F.3d 448, 455 (5th Cir. 2000); *see Floyd v. Bowen,* 833 F.2d 529, 531 (5th Cir.1987).

## Issues

1.     Whether the ALJ properly considered Plaintiff's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis; and

2.     Whether substantial evidence supports the ALJ's finding at step five of the sequential evaluation process.

## Analysis

**Whether the ALJ properly considered Plaintiff's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis**

The crux of Plaintiff's contention is that the ALJ improperly relied on Plaintiff's daily living activities in formulating Plaintiff's RFC and determining that Plaintiff could sustain competitive work. (Pl.'s Br. 10-12.) To support her argument, Plaintiff urges this Court to find case law in the Eighth and Tenth Circuits persuasive. (*Id.)* Plaintiff concedes, however, that such case law is not precedent and binding on this Court. (*Id.* at 12.) Plaintiff also argues that her dyspnea, daytime

---

[4]  The terms of 20 C.F.R. § 404.1527(a)(2) provide:

(2) Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

sleepiness, and fatigue prevent her from maintaining substantial gainful employment. (*Id.* at 9.) Plaintiff avers that her treating physician's opinion supports limitations from these impairments. (*Id.* at 9-10.)

An individual's RFC is her ability to perform physical and mental work activities on a regular and continuing basis notwithstanding limitations from her impairments. 20 CFR §404.1545. A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. SSR 96-8p, at *2. The ALJ is responsible for determining a claimant's RFC. 20 CFR § 404.1546(c). In assessing the claimant's RFC, the ALJ will consider all medical evidence as well as other evidence provided by the claimant. 20 CFR §404.1545(a)(3). The ALJ is not required to incorporate limitations in the RFC that she did not find to be supported in the record. *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir.1988).

The ALJ determined that based on Plaintiff's age, education, work experience, medical conditions, and limitations, she retained the RFC to perform sedentary work in that she could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for two hours and sit for six hours in an eight-hour workday; however she was limited to occasional crawling, bending, and stooping, and she could not be required to climb. The ALJ also found that Plaintiff must avoid exposure to fumes, gases, chemicals, and temperature extremes; and she should be limited to simple work requiring reading and writing at no more than a third-grade level.

The Court first addresses Plaintiff's argument that the ALJ improperly considered Plaintiff's activities of daily living in formulating her RFC. The Court initially notes that Plaintiff's daily activities were specifically considered by the ALJ in finding that Plaintiff did not meet or equal the criteria for a medical listing, and in assessing Plaintiff's credibility regarding her alleged symptoms.

(Tr. 838, 840.) To the extent Plaintiff's daily living activities may have been considered by the ALJ in assessing the RFC, the activities were merely one small factor the ALJ examined, and such consideration was proper under the Social Security regulations and Fifth Circuit case law. *See* 20 C.F.R. §§ 404.1545(e); 404.1529(c) (in assessing the limitations to be included in the RFC, the ALJ will consider all of the medical and non-medical evidence, including a claimant's daily living activities); *Leggett*, 67 F.3d at 565 n.12 ("It is appropriate for the Court to consider the claimant's daily activities when deciding the claimant's disability status.") (citing *Reyes v. Sullivan,* 915 F.2d 151, 155 (5th Cir.1990) (per curiam)). This Court is, of course, bound by Fifth Circuit precedent, and thus, declines to adopt contrary reasoning that has been developed in the Eighth and Tenth Circuits. *See Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993).

Moreover, insofar as Plaintiff alleges that the ALJ mischaracterized Plaintiff's daily living activities, this Court disagrees. At the second hearing, Plaintiff testified that she is able to bathe, dress, and take care of herself. Plaintiff testified that she tries to do household chores. Plaintiff stated that she has raised her niece; making sure she gets up, eats breakfast, and goes to school. Plaintiff also indicated that when her niece was younger, she helped her with her homework. In her brief, Plaintiff argued that she did not solely take care of her niece and that her family helped her too. (Pl.'s Br. 10.) However, Plaintiff testified that her family helped her *financially* take care of her niece, which is trivial when considering Plaintiff's ability to perform daily activities. Plaintiff testified that she has a driver's license, and that she last drove three months, or maybe one year, prior to the hearing. Plaintiff also stated that she attends church two to three times a month, and that she visits

with her neighbors once or twice a week. This Court agrees with the ALJ's finding that Plaintiff only had mild restrictions in her daily living activities.[5] (Tr. 838.)

Plaintiff additionally argues that the limitations resulting from her dyspnea, sarcoidosis, daytime sleepiness, and fatigue were not properly accounted for in the ALJ's RFC assessment. (Pl.'s Br. 9.) To support this contention, Plaintiff points to the opinions of her treating physician, Dr. Dilley. "The opinion of the treating physician who is familiar with the claimant's impairments, treatments, and responses, should be accorded great weight in determining disability." *Newton,* 209 F.3d at 455 (citing *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237). A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). On the other hand "[g]ood cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton*, 209 F.3d at 456. If good cause is shown, then the ALJ may accord the treating physician's opinion less weight, little weight, or even no weight. *Paul v. Shalala,* 29 F.3d 208, 211 (5th Cir. 1995). If the ALJ does not accord a treating doctor's opinion controlling weight, the ALJ

---

[5] Plaintiff contends that at the first hearing she testified that she did not cook her own meals, do her own laundry, or clean her apartment. (Pl.'s Br. 10; Tr. 39-42.) At the first hearing, Plaintiff testified that she can bathe and dress herself, but she can only prepare a TV dinner in the microwave every once in a while. (Tr. 39-41.) Insofar as this testimony conflicts with her testimony at the second hearing, such inconsistencies merely lessen the credibility of Plaintiff and do not serve to override her testimony at the second hearing.

must set forth specific reasons for the weight given, supported by the medical evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2).

Here, the ALJ gave no weight to the opinions of Dr. Dilley because the ALJ explained that his opinions were inconsistent with his own treatment notes, the other medical evidence in the record, and Plaintiff's daily living activities. (Tr. 841-42.) On September 13, 2004, Dr. Dilley opined that Plaintiff was disabled due to her sarcoidosis diagnosis, which involved both of her lungs and caused her significant shortness of breath. (Tr. 567.) However, an examination by Dr. Al-Farra on May 12, 2004, only a few months prior to Dr. Dilley's written opinion, revealed that Plaintiff was not showing any evidence of active sarcoidosis. (Tr. 437-38.) Further, at the examination, the doctor indicated that Plaintiff's sleepiness had decreased since she began C-PAP therapy for her obstructive sleep apnea. (Tr. 437.) Following Plaintiff's inpatient hospital care in September 2002 for sarcoidosis, wherein Plaintiff had been off her steroid treatments for six months, there is no evidence that she thereafter experienced continued exacerbations. On June 27, 2003, Plaintiff had a follow-up visit with Dr. Dilley, wherein it was noted that her sarcoidosis was inactive and stable with steroid treatments. (Tr. 568.) On March 28, 2005, a pulmonary test demonstrated that Plaintiff had normal lung volumes and a minimal gas transfer deficit. (Tr. 290-91.) On October 11, 2005, Dr. Al-Farra conducted another examination of Plaintiff, wherein he again found that there was no evidence of active sarcoidosis. (Tr. 453-54.) The doctor indicated that this may be due to Plaintiff taking Prednisone. (Tr. 454.) The doctor also noted that Plaintiff's shortness of breath had improved significantly with her continued use of steroids. (*Id.*) An impairment that can be controlled or remedied by medication or therapy cannot serve as a basis for a finding of disability. *Johnson v. Bowen,* 864 F.2d 340, 348 (5th Cir. 1988).

16

On March 27, 2006, Dr. Dilley examined Plaintiff and x-rays revealed that there was no evidence of sarcoidosis. (Tr. 565.) Plaintiff complained of shortness of breath, however, Dr. Dilley noted that Plaintiff had been off her medications for about a month. (*Id.*) Dr. Dilley also indicated that her last visit was about two years prior. (*Id.*) The doctor noted Plaintiff's dyspnea as mild and her sarcoidosis as inactive. (*Id.*) Although Plaintiff was hospitalized in July 2006 for six days, Dr. Dilley noted that Plaintiff had been off steroids for several months and she was stable upon discharge. (Tr. 570.) Non-compliance with treatment prescribed by physicians is grounds for a finding of not disabled. *Johnson v. Sullivan,* 894 F.2d 683, 685 n.4 (5th Cir. 1990). The medical evidence is replete with records indicating that when Plaintiff is taking Prednisone, her sarcoidosis is inactive and her dyspnea improves. Plaintiff's hospitalizations only occur when Plaintiff is off her steroid medication.

Dr. Dilley opined on October 24, 2007 that Plaintiff could only work 2 hours in an 8-hour workday. (Tr. 805.) In February 2008, Dr. Dilley opined that Plaintiff could not work at all. (Tr. 800.) There simply is no medical evidence to support these opinions. Dr. Dilley's own treatment notes show, on more than one occasion, that Plaintiff's sarcoidosis was inactive and stable. (Tr. 565, 568.) Treatment notes of Dr. Al-Farra indicate the same. Further, in March of 2006, Dr. Dilley noted that he hadn't even seen Plaintiff in two years. Regarding Plaintiff's daytime sleepiness and fatigue, Dr. Al-Farra noted that when Plaintiff uses her C-PAP machine, her sleepiness scores are within normal limits. He also indicated that Plaintiff's excessive sleepiness was due to her not being compliant with his recommendations regarding her sleep hygiene. Non-compliance with treatment prescribed by physicians is grounds for a finding of not disabled. *Johnson,* 894 F.2d at 685 n.4.

Insofar as Plaintiff contends that the ALJ was required to make a separate finding regarding Plaintiff's ability to work on a sustained basis, such argument fails. In the Fifth Circuit, a claimant's ability to maintain employment is incorporated in the RFC determination unless a showing has been made that the claimant's ailment "waxes and wanes" in its manifestation of disabling symptoms. *See Frank v. Barnhart,* 326 F.3d 618, 619 (5th Cir. 2003); *Perez v. Barnhart,* 415 F.3d 457, 465 (5th Cir. 2005). The court in *Frank* made it clear that the ALJ does not have a duty in every case to make a separate finding that the claimant can maintain employment. 326 F.3d at 619. Plaintiff does not allege, and there has been no evidence, that Plaintiff's impairments wax and wane. Accordingly, Plaintiff's ability to maintain employment was incorporated in her RFC.

The Court finds that the ALJ had good cause to assign Dr. Dilley's opinions no weight. The medical and non-medical evidence of record supports the ALJ's RFC formulation. Further, the Court notes that the ALJ restricted Plaintiff's work capabilities substantially more than the state agency medical consultant. The ALJ did find that Plaintiff's impairments caused her limitations, and he appropriately included such limitations from her dyspnea, sarcoidosis, daytime sleepiness, and fatigue in her RFC formulation. The ALJ did not commit legal error and her RFC assessment is supported by substantial evidence.

**Whether substantial evidence supports the ALJ's finding at step five of the sequential evaluation process**

Plaintiff contends that the VE's testimony conflicts with the provisions in the DOT, and therefore, the ALJ was not entitled to rely on the VE's testimony in determining that Plaintiff could perform the occupations of final assembler, cutter/paster, and addresser. (Pl.'s Br. 12-16.)

Accordingly, Plaintiff avers that the ALJ failed to meet her step five burden and substantial evidence does not support her decision.

Under the Social Security Rulings, occupational evidence provided by a VE generally should be consistent with the occupational information supplied by the DOT. SSR 00-4p, 2000 SSR LEXIS 8, at *4 (December 4, 2000). As part of the ALJ's duty to fully develop the record of a hearing, the ALJ "will inquire, on the record, as to whether or not there is such consistency." *Id*. at *5. When there is an apparent unresolved conflict between VE evidence and the DOT, the ALJ must elicit a reasonable explanation for the conflict before relying on the VE evidence to support a determination of disability. *Id*. Neither the DOT nor the VE evidence automatically "trumps" the other when there is a conflict. *Id*. A conflict must be resolved by determining whether the explanation given by the VE is reasonable and provides a basis for relying on the VE testimony rather than on the DOT information. *Id*. The ALJ must explain in the determination or decision how any conflict that has been identified was resolved. *Id*. at *1. Failure on the part of the ALJ to fully develop the record only requires reversal if the claimant demonstrates that she was prejudiced by the ALJ's failure. *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000) (citing *Brock v. Chater,* 84 F.3d 726 (5th Cir.1996); *Kane v. Heckler,* 731 F.2d 1216 (5th Cir.1984)). "To establish prejudice, a claimant must demonstrate that he or she 'could and would have adduced evidence that might have altered the result.'" *Id.* (quoting *Kane,* 731 F.2d at 1220).

Here, the ALJ failed to fully develop the facts in the record, as she did not inquire as to whether the VE's testimony was consistent with the DOT. However, such failure does not require reversal because Plaintiff was not prejudiced by the ALJ's failure. At step five in her analysis, the ALJ found that Plaintiff could perform the occupations of final assembler, cutter/paster, and

addresser pursuant to the testimony of the VE. (Tr. 843.) Plaintiff argues that the VE's testimony regarding all three of these occupations conflicts with the DOT and is inconsistent with Plaintiff's RFC. This Court disagrees.

Regarding the occupation of final assembler, Plaintiff first asserts that the VE did not testify that the hypothetical individual with Plaintiff's physical and mental limitations could perform the position of final assembler. (Pl.'s Br. 14.) However, in Plaintiff's reply brief, she concedes that the VE did find the individual capable of performing the occupation. (Pl.'s Reply Br. 7.) Indeed, the VE did provide the occupation of final assembler in response to the ALJ's hypothetical question at the second hearing. (Tr. 901.) Next, Plaintiff contends that the position of final assembler is inconsistent with the DOT and her RFC because the position is classified as a bench work occupation in the DOT and Plaintiff has environmental limitations which would preclude such work. (Pl.'s Br. 14.) In support of this contention, Plaintiff mischaracterizes the law. Plaintiff argues that the Social Security regulations provide "[m]achine trades and bench work by their nature often involve exposure to dust, fumes, and other suspended particulate irritating or intolerable to persons afflicted with respiratory ailments." (*Id.*) In her brief, Plaintiff cites this quotation as coming from 20 C.F.R. Subpart P, App. 2, s 201.00(a). However, section 201.00(a) of Appendix 2 of the regulations provides:

> Most sedentary occupations fall within the skilled, semi-skilled, professional, administrative, technical, clerical, and benchwork classifications. Approximately 200 separate unskilled sedentary occupations can be identified, each representing numerous jobs in the national economy. Approximately 85 percent of these jobs are in the machine trades and benchwork occupational categories. These jobs (unskilled sedentary occupations) may be performed after a short demonstration or within 30 days.

20 C.F.R. Subpart P, App. 2, s 201.00(a). This section is void of any mention of exposure to dust or fumes with benchwork occupations. Furthermore, the Court thoroughly examined the regulations and found no such quotation. Nonetheless, upon a search of the relevant case law, it appears that Plaintiff is quoting dicta from *Thomas v. Schweiker*, 666 F.2d 999, 1004 n.8 (5th Cir. 1982). This case is distinguishable from the matter at hand.

In *Thomas,* the ALJ utilized the Medical-Vocational guidelines, instead of the testimony of a VE, to determine that the claimant could perform sedentary work and thus was not disabled. *Id.* at 1001. The Medical-Vocational guidelines only account for exertional limitations, not environmental limitations. *Id.* at 1003-004. The claimant in *Thomas* had respiratory problems that she claimed were not accounted for in the guidelines. *Id.* The Court of Appeals remanded the case back to the Commissioner to determine if an environmental limitation was present, and if so, to elicit testimony from a VE regarding positions the claimant could perform in light of all of her limitations. *Id.* at 1005.

Here, the ALJ did not use the Medical-Vocational guidelines to find Plaintiff not disabled. The ALJ elicited testimony from a VE after presenting the VE with a hypothetical which included exertional, non-exertional, and environmental limitations. (Tr. 900.) The environmental limitations that the ALJ included in the hypothetical limited Plaintiff to "[n]o exposure to chemicals, fumes, gases, temperature extremes". (*Id.*) The VE testified that the hypothetical individual could perform the occupation of final assembler. However, the VE stated "[t]o fit the restrictions in the hypotheticals the numbers are depleted to 7,900 positions existing in the state of Texas and 123,700 in the U.S." (Tr. 901.) Thus, the VE did account for Plaintiff's environmental limitations in providing this occupation.

Furthermore, the quote from *Thomas* states that benchwork and machine trade occupations *often* involve exposure to dust and fumes. 666 F.2d at 1004 n.8. Thus, it can be inferred that many of the positions categorized as benchwork occupations will have exposure to dust and fumes, however some will not. Moreover, the DOT occupational classification system places all occupations into one of nine broad categories, one of those categories being benchwork occupations. *Dictionary of Occupational Titles,* 1991 WL 645965 (Jan. 1, 2008). Then each category is broken down into 83 different specific divisions. *Id.* Those divisions, in turn, are divided into small homogenous groups, which form the actual DOT occupations, such as final assembler. *Id.* It would be incredulous to assume that all of the occupations in those 83 different divisions have exposure to dust and fumes. In fact, upon review of the DOT description for final assembler, it lists the following conditions as not present: extreme cold, extreme heat, exposure to weather, atmospheric conditions, radiation, explosives, toxic caustic chemicals, and other environmental conditions. DICOT 713.687-018, 1991 WL 679271. These are the precise environmental limitations for which Plaintiff is limited.

The Court finds that Plaintiff's claim lacks merit, as there is no conflict between the VE's testimony regarding the final assembler occupation and the provisions of the DOT. Additionally, there is no conflict between the occupation and Plaintiff's RFC. Thus, Plaintiff was not prejudiced by the ALJ's failure to inquire on the record as to whether the VE's testimony conflicted with the DOT. Accordingly, the ALJ properly relied on the testimony of the VE in making her step five determination and reversal is not required. *See Carey*, 230 F.3d at 142.

Plaintiff additionally argues that the ALJ could not properly rely on the occupations of cutter/paster and assembler because the VE's testimony conflicted with the DOT regarding these occupations as well. Although the Court finds that a potential conflict does exist with the addresser

occupation, as the ALJ limited Plaintiff to reading and writing at no more than a 3rd grade level, and the DOT's language level is 2, which the VE testified constitutes 4th through 6th grade levels, the Court need not address this conflict. *See Gaspard v. Soc. Sec. Admin. Com'r*, 609 F.Supp.2d 607, 617 (E.D. Tex. 2009) ("[t]he Commissioner's burden at Step 5 of the sequential evaluation process . . . is satisfied by showing the existence of only *one* job with a significant number of available positions that the claimant can perform.") (citing *Evans v. Chater,* 55 F.3d 530, 532-33 (10th Cir.1995)). The ALJ has met her step five burden by showing that Plaintiff is capable of performing the final assembler occupation, which exists in significant numbers of 7,900 positions in the state of Texas and 123,700 in the United States. Thus, even if a conflict did exist between the addresser and cutter/paster occupations, the ALJ could accurately rely on the final assembler occupation in making her decision. Hence, such proffered error would not be prejudicial and warrant a reversal of the Commissioner's decision. *See Gaspard,* 609 F.Supp.2d at 617 (holding that the alleged error by the plaintiff did not require reversal because the VE identified two other occupations that did not conflict with the plaintiff's limitations and upon which the ALJ could properly rely). The Court concludes that reversal is not required and substantial evidence supports the ALJ's decision.

### Recommendation

For the foregoing reasons, the Court recommends that the District Court **AFFIRM** the final decision of the Commissioner, as it is supported by substantial evidence, and dismiss Plaintiff's Complaint against the Commissioner with prejudice.

**SO RECOMMENDED**, March 1, 2013.


PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within fourteen days after service. A party filing objections must specifically identify those fndings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory, or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within fourteen days after service shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).